IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KENNETH SMITH,                         :

      Petitioner,                 :

                                       Case No. 1:99cv832

      vs.                         :

                                  JUDGE WALTER HERBERT RICE

BETTY MITCHELL,                        :
WARDEN                                 :

      Respondent.                 :

---

DECISION AND ENTRY OVERRULING PETITIONER'S OBJECTIONS
(DOC. #44) TO REPORT AND RECOMMENDATIONS ON REMAND OF
MAGISTRATE JUDGE (DOC. #41); REPORT AND
RECOMMENDATIONS ON REMAND OF MAGISTRATE JUDGE
(DOC. #41) ADOPTED; JUDGMENT TO BE ENTERED IN FAVOR OF
RESPONDENT AND AGAINST PETITIONER; PETITIONER GRANTED
CERTIFICATE OF APPEALABILITY ON SIXTEENTH GROUND FOR
RELIEF; PETITIONER GRANTED IN FORMA PAUPERIS STATUS FOR
APPEAL; TERMINATION ENTRY

---

The Petitioner Kenneth Smith ("Smith" or "Petitioner") was charged with two counts of aggravated murder, with three death penalty specifications, as well as with two counts of aggravated robbery. Those charges stemmed from the murders of Lewis and Ruth Ray (collectively the "Rays"). As with other death penalty trials in Ohio, the Petitioner's trial proceeded in two phases with the guilt phase followed by a sentencing or mitigation phase. On January 26, 1996, Petitioner was convicted by a Butler County jury on all counts. After hearing

mitigation evidence, the jury recommended that Smith be sentenced to death. Thereafter, Judge Anthony Valen, who had presided over Smith's trial, conducted his own independent review of the evidence and found that the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Accordingly, that judicial officer sentenced Smith to death.

In accordance with Ohio law, Petitioner appealed to the Ohio Supreme Court, which affirmed his conviction.[1] State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), cert. denied, 523 U.S. 1125 (1998). The Ohio Supreme Court also independently weighed the aggravating circumstances and mitigating factors, concluding that the state had met its burden of proof in that regard. In its decision, the Ohio Supreme Court summarized the facts and circumstances surrounding the crimes for which the Petitioner was convicted:

> On May 12, 1995, sometime around 11:00 p.m., defendant-appellant, Kenneth W. Smith ("defendant"), and his brother, Randy Smith ("Randy"), brutally murdered Lewis Ray and Ruth Ray in their Hamilton, Ohio[,] home. Lewis was severely beaten, his skull was fractured, and his throat was slit, severing his windpipe and carotid arteries. Ruth died from manual strangulation. Their home was ransacked, and money and jewelry were taken. The following morning, David L. Lester, Ruth's son, discovered the bodies of his mother and stepfather and called the police.
> In the Rays' home, police observed signs of a struggle, blood on the kitchen floor, and bloody footprints throughout the house. Police found a damaged white ceramic coffee pot covered with blood stains in the trash can and a green army camouflage hat on the floor. A knife had recently been removed from a butcher block set. Police found Lewis lying on the kitchen floor and Ruth lying in the doorway between the hall and bedroom.

---

[1]Smith also sought to appeal his conviction and sentence to the Butler County Court of Appeals, challenging the constitutionality of a then recent change in Ohio law, limiting a defendant, who has had the death penalty imposed upon him, only to an appeal to the Ohio Supreme Court. The Butler County Court of Appeals dismissed that appeal.

The Rays' bedroom had been ransacked, and the contents of dressers were strewn about the floor.

Earlier in the evening of May 12, 1995, defendant and Randy had gone to the Crystal Lounge, a.k.a. Crystal Bar, with a friend, Russell C. Baker. At approximately 10:20 p.m., defendant borrowed Baker's car allegedly to pick up his wife, Brenda Smith, and some friends. By midnight, defendant had not returned Russell's car. At about that time, Brenda and Lillian Canafax, Randy's live-in girlfriend, arrived at the Crystal Lounge also looking for the Smith brothers. About forty-five minutes later, Russell and the two women decided to go to Chasteen['s] Bar. Defendant eventually showed up at Chasteen['s] Bar at approximately 1:30 a.m. When Russell questioned defendant about the car, defendant claimed that he was late because he had been in a fight at a gas station. Defendant showed Russell a bump on his head. At the time, Russell also noticed that defendant had changed his clothes.

At approximately 2:00 a.m., defendant left Chasteen['s] Bar in his Monte Carlo automobile with Brenda, Randy, Lillian, and Russell. Defendant drove to his house, handed his car keys to Randy, and instructed Randy to take a stuffed pillowcase from a nearby blue automobile and put it into the trunk of the Monte Carlo. Russell accused the Smith brothers of being "out thieving with my car." Defendant replied, "Russell, I wouldn't do that." The group then drove to Buckeye Street, where Russell's brother, James, was staying. Russell soon went home and to bed.

In the early hours of May 13, 1995, defendant admitted to his friend, James Baker, that he had killed Lewis Ray and that his brother, Randy, had strangled Ruth Ray. James testified that on May 12, 1995, he was staying at his mother's apartment, when defendant and Randy arrived at approximately 1:30 a.m. in Russell's automobile. The Smiths had been to the apartment earlier in the evening before going to the Crystal Lounge. Defendant told James that he had been in a fight, and James noticed that defendant had cleaned up and changed clothes. Defendant was wearing a sweater and boots instead of tennis shoes. He was not wearing a hat. James further testified that defendant left the apartment again at 1:35 a.m. to go to Chasteen['s] Bar.

When defendant returned to James's mother's apartment at approximately 2:45 a.m., he began to tell James about the murders. James testified that defendant told him that he had taken a hammer and "struck Louie Ray between his eye[s]," and that during this time, defendant had winked at his brother, Randy, who followed Ruth into a bedroom and strangled her. Defendant also told James that they took gold and jewelry in a pillowcase from the Rays' home.

James testified that when he asked defendant why he killed the Rays, defendant replied that they had killed them to prevent the Rays from

identifying them. James testified that defendant "was talking how he sliced Lewis Ray's throat from ear to ear and just laughing about it." Defendant also told James that after he killed Lewis, he "kicked Ruth's brain in" to make sure she was dead. James testified that defendant brought a pillowcase stuffed with jewelry inside the apartment, but James asked him to take it back to the car.

Later that morning, James was driving around with defendant and Brenda. They stopped to buy cigarettes and marijuana. Defendant mentioned to James that he was concerned because he lost his green army camouflage hat in the struggle with Lewis. Eventually they drove to Russell's home. There, out of defendant's presence, James told Russell what defendant had admitted. Defendant then suggested to James that he hide the remaining jewelry. This prompted Russell to contact the police. Police later recovered the jewelry in the attic of a garage.

In addition to the testimony of James Baker, Lillian Canafax testified that she was outside Chasteen[']s Bar arguing with Randy when he showed her a gun. She testified that she saw the same gun in her bedroom the following morning. Several days later, after she found the gun and money under the bed, she authorized police to search the apartment. Lillian also turned over to police three money orders she had purchased for Randy the day after these crimes occurred.

Another witness testified that around 11:15 or 11:30 p.m., he saw Randy standing outside a pizza parlor about a block from the Rays' residence. The witness testified that Randy had a hammer in his hand as he ducked behind the building. Russell testified that a hammer was missing from his car after he had loaned his car to defendant.

That afternoon, the police detained defendant for questioning. At the time, police observed cuts and scratches on defendant's face, and a long cut and bruises near his right collarbone. Police also searched Brenda's purse and discovered a cellophane bag containing rings, two $100 bills, and a quantity of nonsequentially numbered food stamps. Police knew that Lewis sold similar jewelry and suspected that he may have dealt in food stamps as currency.

At the police station, defendant waived his Miranda rights and admitted that he and Randy had killed Lewis and Ruth. Defendant said that while at the Crystal Bar, he and Randy had talked about going to rob the Rays, and decided that they would have to kill the Rays because they did not want the Rays to be able to identify them. Defendant told police that after arriving at the Rays' house, he and Lewis began to argue about money that defendant supposedly owed Lewis. Defendant further admitted that he picked up an object from the kitchen counter and struck Lewis, eventually overpowering him. Defendant claimed that Lewis said, "I'm going to kill you, Kenny," so defendant grabbed a knife and cut Lewis's throat. He then

rolled Lewis on his side and took his wallet. Defendant said he walked to the bedroom and saw Ruth's body on the floor. Randy had choked her to death. The two men ransacked the bedroom and left in Russell's automobile.

Police apprehended Randy Smith. They found $344 in bloodstained currency on him. Randy initially denied any knowledge of the murders. Police allowed Randy to speak with his brother, who said, "They got us brother, everybody is telling on us, tell the truth, that's what I did." Randy then explained to the police his involvement in the crimes.

Later, after again being advised of his <u>Miranda</u> rights, defendant gave the police a written confession. In his statement, defendant said that while playing pool at the Crystal Lounge, he talked with Randy about robbing Lewis. He borrowed Russell's car and drove to a pool hall about half a block from the Ray home. Defendant stated that he and his brother walked to the Rays' house. Lewis invited the Smiths into his home. Defendant and Lewis began to argue about $2,500 that defendant owed Lewis. The men began to fight in the kitchen and defendant grabbed something from the counter and struck Lewis's head. They continued to wrestle on the floor. Defendant knew he was going to have to kill Lewis to keep him from telling anyone what happened. Defendant then grabbed a knife and "sliced Louie across the throat."

In his written confession, defendant further admitted that he took Lewis's wallet, then walked into the bedroom. Ruth was lying on the floor in the doorway, and defendant had to step over her body. Defendant said he asked Randy what had happened, and Randy said he had choked Ruth. Defendant further admitted that he then ransacked the bedroom, taking rings, watches, and necklaces, and placed the items in a plastic bag and left.

According to his signed confession, defendant went home after the murders to shower and change clothes. He and Randy divided the money found in Lewis's wallet. Defendant's share was around $625. Defendant then put his bloody clothes, the knife, and Lewis's wallet into a green trash bag that Randy later threw into the river. The two men then drove to Chasteen[']s Bar.

In his confession, defendant explained that after leaving Chasteen[']s Bar, he drove to the apartment where James Baker was staying and began to go through the jewelry that the defendant and Randy had taken from the Rays' house. Defendant picked out some items he wanted to keep. The following morning he placed some rings into a plastic bag and gave them to Brenda, who put them into her purse. Defendant put the remainder of the jewelry into the trunk of his Monte Carlo. He and James then put the jewelry into the attic of James's grandmother's garage. During police questioning, defendant also admitted that the wristwatch he was wearing had belonged to Lewis.

At trial, defendant testified that he and Randy went to the Rays, intending only to steal saws and drills from the yard. They parked the car away from the house, but as they walked into the yard, Lewis opened the gate and saw them. Lewis invited them into the house, and the men began to argue about money that defendant allegedly owed Lewis. Defendant testified that within ten minutes, "everything got real violent." Lewis "jumped up," told defendant he "was going to shoot" him, and hit defendant "upside the head with something." Defendant testified that he grabbed something from near the stove and struck Lewis. Defendant testified that Lewis tried to push him down the basement steps. Defendant then grabbed a knife and cut Lewis as he approached. Defendant bent down, turned Lewis on his side, and grabbed his wallet. Defendant further testified that Randy told him that he had choked Ruth. The brothers then ransacked the bedroom, taking jewelry.

Defendant denied that he intended to kill the Rays. Defendant claimed that Lewis was his best friend, and he "wouldn't cold blooded kill him for nothing." Defendant testified that he was very upset about the Rays because they were "like family" to him. He admitted that he told James about killing Lewis, but testified that he wasn't laughing or joking, but instead, he was "in tears."

Id. at 90-93, 684 N.E.2d at 675-77.[2]

Thereafter, Smith continued to attempt to secure relief in the Ohio courts, by seeking post-conviction relief pursuant to Ohio Revised Code § 2953.21. His petition for post-conviction relief was denied by the Butler County Common Pleas Court without an evidentiary hearing, a decision which was affirmed by the Hamilton County Court of Appeals. See State v. Smith, 1998 WL 549964 (Ohio App.), appeal not allowed, 84 Ohio St.3d 1469, 704 N.E.2d 578 (1998), cert. denied, 516 U.S. 950 (1995).

---

[2]Randy Smith was also convicted of aggravated murder for his role in the deaths of Lewis and Ruth Ray; however, unlike his brother, Randy Smith was sentenced to life imprisonment, after the jury declined to recommend the death penalty. See State v. Smith, 1996 WL 707125 (Ohio App. 1996).

After having exhausted his available state remedies, Petitioner initiated this action, requesting a writ of habeas corpus, alleging that his convictions and sentences violated a number of provisions of the United States Constitution.  In his Petition (Doc. #15), the Petitioner set forth 19 separate claims or grounds for relief.  This Court referred the matter to Magistrate Judge Michael Merz.  On December 26, 2002, Judge Merz issued his Report and Recommendations, recommending that the Court deny the Petitioner's request for relief.  See Doc. #35.  In its Decision of September 30, 2003 (Doc. #40), the Court sustained in part and overruled in part Petitioner's Objections to the Report and Recommendations of the Magistrate Judge (Doc. #38).  In particular, it sustained those Objections as they related to sub-claims 2 and 3 of the Third Ground for Relief and sub-claim 3 of the Sixth Claim for Relief.[3]  The Court remanded those matters to Judge Merz for a report and recommendations on the merits of those three sub-claims.  Otherwise the Court overruled Smith's Objections.  Judge Merz has filed his such a document, recommending that the Court deny relief to the Petitioner on the merits of those sub-claims.  See Doc. #41.  That judicial officer also recommended that the Court deny the Petitioner a certificate of appealability on all of the remaining three sub-claims.  Id.

This case is now before the Court on the Petitioner's Objections to the Report and Recommendations on Remand (Doc. #44), with which he challenges the recommendations of the Magistrate Judge on all three sub-claims.  The Respondent has not filed a memorandum in opposition to those Objections.  The

---

[3]Judge Merz had recommended that the Court conclude that those sub-claims were barred by the Petitioner's procedural default.  The Court disagreed with that recommendation.

Court begins its analysis by setting forth the standard of review it must apply when it reviews Reports and Recommendations of a Magistrate Judge in a habeas corpus proceeding.  The Sixth Circuit has indicated that a District Court must apply a de novo standard of review to such a judicial filing.  Flournoy v. Marshall, 842 F.2d 875 (6th Cir. 1988).  Accordingly, this Court reviews both Judge Merz' factual findings and his legal conclusions de novo.

In addition to ruling on the Petitioner's Objections, the Court herein decides whether Petitioner is entitled to a certificate of appealability on any of the three sub-claims upon which it concludes that he is not entitled to relief.  The requirement for such a certificate is found in 28 U.S.C. § 2253(c), which provides:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In Slack v. McDaniel, 529 U.S. 473 (2000), the Supreme Court explained that an applicant for a certificate of appealability could make "a substantial showing of the denial of a constitutional right," as required by § 2253(c)(2), in accordance with the standard adopted in Barefoot v. Estelle, 463 U.S. 880 (1983).  529 U.S. at 483-84.  The Slack Court explained that when the District Court has rejected a petitioner's constitutional claim on the merits, he must show that "reasonable

- **8** -

jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. at 484.  With respect to instances in which the District Court denies relief on procedural grounds, the Slack Court held:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Id.  In Miller-El v. Cockrell, 537 U.S. 322 (2003), the Supreme Court reaffirmed the standards for the granting of a certificate of appealability it had established in Slack.  In its earlier Decision herein (Doc. #40), the Court granted the Petitioner a certificate of appealability on the Sixteenth Ground for Relief, alone.

In that earlier Decision, this Court concluded that it must apply the version of 28 U.S.C. § 2254(d), added by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, because Petitioner initiated this action after the AEDPA became effective on April 24, 1996.  See Doc. #40 at 8 (citing Lindh v. Murphy, 521 U.S. 320 (1997)).

That statute provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim−

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court clarified the meaning of the post-AEDPA version of § 2254(d).  In particular, the Court noted that § 2254(d)(1) contains two clauses, to wit: the "contrary to" and "unreasonable application" clauses, which have independent meanings.  Id. at 404.  With respect to the "contrary to" clause, the Court noted that "[a] state [] court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases," and that "[a] state [] court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."  Id. at 405-06.  The Supreme Court held that the "unreasonable application" clause will be violated, if a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  Id. at 407-08.  The Williams Court explained that a state court will have unreasonably applied Supreme Court precedent, if it "unreasonably refuses to extend that [precedent] to a new context where it should apply."  Id. at 407.  The Supreme Court also indicated that the inquiry is an objective one and rejected the argument that the "reasonable jurist" standard should be applied.  Id. at 409-10.  Although the Supreme Court did not define "objectively unreasonable," it did indicate that an unreasonable application of federal law is different from an incorrect application of same.  Id. at 410.  Thus, a writ of habeas corpus will not issue merely because the state court applied federal law incorrectly or erroneously.  Id. at 411.  The Williams Court also indicated that "clearly established federal law" is comprised of "rules of law [that] may be

sufficiently clear for habeas purposes even when they are expressed in terms of a
generalized standard rather than as a bright-line rule." Id. at 382. In contrast, a
rule established following a petitioner's conviction "that 'breaks new ground or
imposes a new obligation on the States or the Federal Government'" is not
considered to be clearly established for the purposes of the AEDPA. Id. at 381
(quoting Teague v. Lane, 489 U.S. 288, 301 (1989)). In determining whether a
state court decision was contrary to or an unreasonable application of clearly
established federal law, this Court may look only to "holdings, as opposed to the
dicta, of [the Supreme] Court's decisions as of the time of the relevant state[]court
decision." Id. at 412. See also, Bulls v. Jones, 274 F.3d 329, 333 (6th Cir.
2001).


I.  Sub-Claims 2 and 3 of Third Ground for Relief

    With this ground, the Petitioner argued that his constitutional rights were
violated as a result of fourteen instances of alleged prosecutorial misconduct.
Judge Merz recommended that the Court conclude that Petitioner's failure to object
contemporaneously to the actions of the prosecutor which allegedly constituted
misconduct constituted procedural default which barred the consideration of many
of the fourteen sub-claim claims of the Third Ground for Relief. The Court
disagreed with that recommendation with respect to sub-claims 2 and 3. With
those two sub-claims, the Petitioner has alleged that, during voir dire, the
prosecutor improperly argued that "a man's home is his castle" and misstated the
burden of proof on mitigating factors. As a means of analysis, the Court initially
sets forth the standards it must apply to any claim of prosecutorial misconduct.

The Sixth Circuit has indicated that when prosecutorial misconduct "rises to the level of depriving the defendant of fundamental fairness in the trial process, the claim is remediable on a petition for habeas corpus relief."  Serra v. Michigan Dept. of Corrections, 4 F.3d 1348, 1354 (6th Cir. 1993), cert. denied, 510 U.S. 1201 (1994).  In Boyle v. Million, 201 F.3d 711 (6th Cir. 2000), the Sixth Circuit discussed the factors a court should consider when deciding whether to grant a writ of habeas corpus on the basis of prosecutorial misconduct:

> In United States v. Carroll, 26 F.3d 1380 (6th Cir. 1994), we summarized our recent jurisprudence on the issue of prosecutorial misconduct in an effort to provide guidance for future cases and noted that, when addressing claims of prosecutorial misconduct, we first determine whether the challenged statements were indeed improper.  See United States v. Francis, 170 F.3d 546, 549 (6th Cir. 1999).  Upon a finding of such impropriety, we then "look to see if they were flagrant and warrant reversal."  Id. (citing Carroll, 26 F.3d at 1388).  Flagrancy is determined by an examination of four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused."  Id. at 549-50.

Id. at 717.  Accord, United States v. Garcia-Meza, 403 F.3d 364, 373 (6th Cir. 2005); Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005); DePew v. Anderson, 311 F.3d 742, 749 (6th Cir. 2002).  Under the AEDPA, this Court is required to give deference to the Ohio Supreme Court's rejection of Petitioner's prosecutorial misconduct claims.  Bates, 402 F.3d at 641.  See also, Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004) ("Claims of prosecutorial misconduct are reviewed deferentially on habeas review.").  In determining whether prosecutorial misconduct mandates habeas relief, this Court must apply the harmless error standard.  Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997).  An error is

harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Having set forth the applicable standards, the Court now examines sub-claims 2 and 3.

With sub-claim 2 of the Third Ground for Relief, the Petitioner argues that he was deprived of a constitutionally fair trial as a result of the prosecutor's improper use during voir dire of the argument that "a man's home is his castle."  In rejecting the Petitioner's proposition that the prosecutor's argument in that regard served as the basis for reversing his conviction, the Ohio Supreme Court wrote:

> Defendant claims that during voir dire, the prosecutor "embellished" the phrase, "a man's home is his castle," making it into a legal concept. Defendant did not object to the comment at the time.  However, he now argues that he was prejudiced by this phrase because the location of the murders was irrelevant and he was not charged with burglary.  This legal maxim relates "to the rights of an individual to defend his house against violence, and his person against death."  State v. Nieto (1920), 101 Ohio St. 409, 415, 130 N.E. 663, 664.  Accord State v. Thomas (1997), 77 Ohio St.3d 323, 327, 673 N.E.2d 1339, 1342.  Defendant claimed that Lewis Ray attacked him.  Defendant robbed the Rays in their home.  Reference to the Ray home was not irrelevant, and the prosecutor's reference to this phrase did not result in plain or prejudicial error.

80 Ohio St.3d at 110, 684 N.E.2d at 688-89.  In recommending that the Court reject this sub-claim as a basis for habeas relief, Judge Merz noted that the Ohio Supreme Court had held, as a matter of state law, that the fact that the Rays had been murdered in their own home was not irrelevant.  Doc. #41 at 5.  That judicial officer concluded that the rejection of Petitioner's claim of error based upon the "home is a castle" argument by the Ohio Supreme Court did not constitute an unreasonable application of precedent from the United States Supreme Court, since no decision by that Court has held that a prosecutor engages in misconduct when he points to a relevant fact during voir dire.  Id.

In his Objections, Petitioner argues that the prosecutor's statement during voir dire that a man's home is his castle interjected an irrelevant factor into the prosecution which skewed the trial process and prejudiced him. Doc. #44 at 4. According to Petitioner the cliché that a man's home is his castle "had nothing to do with his case." Id. Thus, the Petitioner bases this sub-claim on the proposition that the Ohio Supreme Court erred when it concluded that the statement was relevant. However, when ruling on a request for a writ of habeas corpus, a Court is not authorized to review the resolution of issues of state law by state courts. See e.g., Maldonado v. Wilson, — F.3d —, 2005 WL 1654766 at *5 (6th Cir. July 15, 2005) (reiterating that "'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.' Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)").

Accordingly, the Court concludes that it was neither contrary to nor an unreasonable application of federal law for the Ohio Supreme Court to reject the Petitioner's assertion that the "home is a castle" argument constituted prosecutorial misconduct. Therefore, the Court overrules the Petitioner's Objections (Doc. #44) to the Report and Recommendations on Remand (Doc. #41), as they relate to sub-claim 2 of the Third Ground for Relief. In addition, since the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right, and that reasonable jurists would not find this Court's rejection of this ground to be debatable or wrong, it will deny the Petitioner a certificate of appealability on this sub-claim.

With sub-claim 3 of the Third Ground for Relief, the Petitioner argues that the prosecutor engaged in misconduct by improperly explaining the concepts of aggravating circumstances and mitigating factors during the individual voir dire of prospective juror Gregory Pheanis ("Pheanis"), by asking him the following question:

> Prosecutor:  Sir, just to clear up any possible misunderstanding, it's not just a question of whether or not any possible mitigating factors are proven or shown, His Honor will instruct you that the State has the burden of showing aggravating factors, the Defendant has a burden of showing mitigating factors, OK, and His Honor will instruct you that you have to weigh them, and <u>if the aggravating factors outweigh the mitigating circumstances, that's one thing, if the mitigating circumstances outweigh the aggravating factor, that's another thing</u>; you could weigh that just like you weigh the evidence in the original case and follow the instructions of the Court in arriving at your verdict?
> Juror Pheanis: Certainly.

T. Tr. at 132-33 (emphasis added).  That was the only question the prosecutor asked of Pheanis during the individual voir dire.  The prosecutor's question followed a number of questions posed by defense counsel.  Id. at 128-32. Defense counsel asked Pheanis some questions about mitigating factors, without mentioning that aggravating circumstances and mitigating factors must be weighed during the sentencing phase of a death penalty prosecution.  Id. at 130-32.

Judge Merz recommended that the Court conclude that the rejection of this claim by the Ohio Supreme Court was not an unreasonable application of federal law, as determined by the United States Supreme Court.  Doc. #41 at 6.  In his Objections, the Petitioner focuses upon the emphasized portion of the prosecutor's question, arguing that the prosecutor misstated the law, by failing to indicate that the state has the burden of proving beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.  Doc. #44 at 4-5.

According to Petitioner, the prosecutor's question violated his constitutional rights, because it resulted in the jury being misled about its role under state law and failed to provide materially accurate sentencing information.  Id. at 5.

This Court agrees that, under Ohio law, "the correct test is whether the aggravating circumstances outweigh mitigating factors, a matter on which the prosecution has the burden of proof beyond a reasonable doubt."  State v. Stallings, 89 Ohio St.3d 280, 284, 731 N.E.2d 159, 167 (2000) (citing Ohio Rev. Code § 2929.03(D)), cert. denied, 534 U.S. 836 (2001).  In addition, the Court agrees that the prosecutor did not explain the state's burden of proof in that regard, during his questioning of the juror on voir dire.  Moreover, the United States Supreme Court has held that a capital defendant's rights under the Eighth Amendment are violated when a prosecutor misleads the jury about its role in sentencing.  Caldwell v. Mississippi, 472 U.S. 320 (1984) (plurality opinion); id. at 342-433 (1985) (O'Connor, concurring in part and concurring in the judgment in part).  See also, Dugger v. Adams, 489 U.S. 401, 407 (1989) ("To establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.").  Nevertheless, this Court cannot agree that the prosecutor's question to Pheanis misstated the law of Ohio, or violated Petitioner's rights under the Eighth Amendment.  The prosecutor was merely attempting to introduce the concept that aggravating circumstances and mitigating factors must be weighed, which defense counsel had neglected to mention during his questioning of Pheanis, rather than giving that prospective juror a detailed description of the role of the jury during the sentencing portion of the trial.  For instance, the prosecutor did not even mention the concept

of burden of proof or expressly state what would happen if aggravating circumstances outweighed mitigating factors, or vice versa.  He only said its "one thing" or "another."  More importantly, he repeatedly stressed that the judge would be instructing the jury on the issue, which the trial judge later did in accurate fashion.

Accordingly, the Court concludes that it was neither contrary to nor an unreasonable application of federal law for the Ohio Supreme Court to reject the Petitioner's assertion that the prosecutor's above-quoted question to Pheanis constituted prosecutorial misconduct.  Therefore, the Court overrules his Objections (Doc. #44) to the Report and Recommendations on Remand (Doc. #41), as they relate to sub-claim 3 of the Third Ground for Relief.  In addition, since the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right, and that reasonable jurists would not find this Court's rejection of this ground to be debatable or wrong, it will deny the Petitioner a certificate of appealability on this sub-claim.


## VI.  Sub-Claim 3 of the Sixth Ground for Relief

With this sub-claim, the Petitioner alleges his trial counsel rendered ineffective assistance during voir dire.  In particular, he challenges his trial attorneys' failure to seek to have jurors Miller and Bowman removed for cause.  He also contends that his trial attorneys were ineffective during their voir dire of juror Wanda Woodry by failing to ask her more questions and by failing to seek her removal for cause.  As a means of analysis, the Court will initially discuss the pertinent portions of the voir dire, following which it will review the standards

which are applicable to all claims of ineffective assistance. The Court will then apply those standards to the instances of alleged ineffective assistance upon which the Petitioner relies.

Juror Miller indicated that she worked with the wife of Detective Nugent ("Nugent"), and that she had met him because he had stopped by the office upon occasion.[4] T. Tr. at 84-85. She also indicated that she was on a first name basis with Nugent. Id. at 85. However, Miller stated that she worked in a different area than Nugent's wife, that she could fairly and impartially judge the facts of the case and that she would not necessarily believe Nugent's testimony merely because he was married to her co-worker and was a police officer. Id. at 85, 88-89.

During voir dire, juror Bowman testified that he knew the Rays, because they had a booth at the Trader's World Flea Market and he had one at the Turtle Creek Flea Market, which was located nearby. Id. at 79. Bowman indicated that he would say hello to the Rays in passing, and described the world of traders as a fraternity, in which everyone knew everyone else. Id at 79-80. Bowman also said that he did not learn of the Rays' names until he read about their murders in the newspaper, and that he could be fair and impartial even though he had had a passing acquaintance with them. Id. at 93-95.

In response to questioning by Judge Valen, Juror Woodrey indicated that a friend, who was a guidance counselor at the high school at which her husband taught, had been stabbed about 53 times by an individual who had been stalking her. T. Tr. at 235-36. Woodrey also indicted that she could be a fair and impartial

---

[4]During voir dire, Petitioner's counsel referred to Nugent as the "principal prosecuting witness." T. Tr. at 88.

juror notwithstanding the fact that her friend had been murdered, and that the incident was not more likely to make her find the Petitioner guilty, since the incidents were entirely different.  Id.  Petitioner's counsel asked Woodrey only three questions about the murder of her friend, two of which were whether that prosecution had gone to trial and whether it was a death penalty case.[5]  Id. at 238.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set forth the standards which must be applied whenever a person convicted of a crime asserts that he was denied effective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.  In United States v. Fortson, 194 F.3d 730 (6th Cir. 1999), the Sixth Circuit elaborated upon the first prong of that test:

> We "presume from the outset that a lawyer is competent, and[,] therefore, 'the burden rests on the accused to demonstrate a constitutional violation.'" Pierce, 62 F.3d at 833 (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)).  Moreover, in applying Strickland, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.

---

[5]The third question, whether the prosecution of the person who had murdered Woodrey's friend could have been a death penalty case, may have been a rhetorical question; however, Woodrey answered it by explaining that she did not know.      T. Tr. at 238.

> The trial process contains a myriad of complex decisions that, for strategic reasons, are sound when made, but may appear unsound with the benefit of hindsight. The defendant, thus, must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (citation omitted).

Id. at 736.

As an initial matter, the Court cannot conclude that counsel's failure to ask additional questions of Woodrey constituted ineffective assistance of counsel, since Petitioner has not suggested what questions should have been asked, what information would have been obtained as a result of those questions and what would have happened if that information had been obtained. Therefore, it is impossible to conclude that the failure to ask such questions was prejudicial, even if one assumes that it constituted deficient performance.

In addition, counsel's failure to request that the three jurors be disqualified for cause was not prejudicial, assuming for sake of argument that it constituted deficient performance. At a minimum, to demonstrate prejudice, Petitioner must show that, if his counsel had challenged the three jurors for cause, they would have been disqualified. Since it would be pure be speculation to conclude so, the Court cannot say that counsel's failure to challenge the three jurors was prejudicial.

Disqualification of a juror for cause in a criminal trial in Ohio was, at the time of the trial of this matter, governed by Rule 24(B) of the Ohio Rules of Criminal Procedure,[6] which provided:

(B) Challenge for cause
A person called as a juror may be challenged for the following causes:

---

[6]Effective July 1, 2005, the Ohio Supreme Court has amended Rule 24, under which former Rule 24(B) has become Rule 24(C), without material change.

(1) That the juror has been convicted of a crime which by law renders the juror disqualified to serve on a jury.

(2) That the juror is a chronic alcoholic, or drug dependent person.

(3) That the juror was a member of the grand jury which found the indictment in the case.

(4) That the juror served on a petit jury drawn in the same cause against the same defendant, and the petit jury was discharged after hearing the evidence or rendering a verdict on the evidence that was set aside.

(5) That the juror served as a juror in a civil case brought against the defendant for the same act.

(6) That the juror has an action pending between him or her and the State of Ohio or the defendant.

(7) That the juror or the juror's spouse is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against the juror.

(8) That the juror has been subpoenaed in good faith as a witness in the case.

(9) That the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

(10) That the juror is related by consanguinity or affinity within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted; or to the defendant.

(11) That the juror is the person alleged to be injured or attempted to be injured by the offense charged, or the person on whose complaint the prosecution was instituted, or the defendant.

(12) That the juror is the employer or employee, or the spouse, parent, son, or daughter of the employer or employee, or the counselor, agent, or attorney, of any person included in division (B)(11) of this rule.

(13) That English is not the juror's native language, and the juror's knowledge of English is insufficient to permit the juror to understand the facts and the law in the case.

(14) That the juror is otherwise unsuitable for any other cause to serve as a juror.

The validity of each challenge listed in division (B) of this rule shall be determined by the court.

Herein, only Rule 24(B)(9) would have served to disqualify the three jurors. Whether to disqualify a juror for cause is in the discretion of the trial court. State v. White, 82 Ohio St.3d 16, 693 N.E.2d 772 (1998). A court deciding whether to exclude a prospective juror for cause must determine whether the juror's views would prevent or substantially impair performance of duties as a juror in accordance with instructions and oath. Id. The Ohio Supreme Court has demonstrated how those standards are to be applied in State v. Sheppard, 84 Ohio St.3d 230, 703 N.E.2d 286 (1998), cert. denied, 527 U.S. 1026 (1999). Therein, the trial court in a death penalty case refused to disqualify for cause a prospective juror who had formerly lived in the neighborhood where the murder occurred and who was acquainted with the victim, as a result of shopping in the victim's store. The Ohio Supreme Court held that the trial court had not abused its discretion by refusing to disqualify the juror, since he (the juror) had unequivocally stated that he could be impartial and decide the case on the facts alone. Id. at 235, 703 N.E.2d at 292. Similarly, herein, Miller indicated that she could fairly and impartially judge the facts, despite the fact that she worked with the wife of a witness. Bowman also indicated that he could impartially decide the case, even though he had had a passing acquaintanceship with the victims. In addition, Woodrey indicated that she could be a fair and impartial juror even though a friend and co-worker of her husband had been murdered. Moreover, during Petitioner's direct appeal, the Ohio Supreme Court concluded the trial court had not abused its discretion by failing, sua sponte, to disqualify the three jurors in question. 80 Ohio St.3d at 105, 684 N.E.2d at 685.

Accordingly, since there is no indication that jurors Miller, Bowman and Woodrey would have been disqualified if they had been challenged for cause, the Court concludes that counsel's failure to do so was not prejudicial, as that word was defined by the United States Supreme Court in <u>Strickland</u>.  Therefore, the rejection by the Ohio Supreme Court of Petitioner's claim that he was the victim of ineffective assistance of counsel as a result of that failure was neither contrary to nor an unreasonable application of federal law.  Consequently, the Court overrules his Objections (Doc. #44) to the Report and Recommendations on Remand (Doc. #41), as they relate to sub-claim 3 of the Sixth Ground for Relief.  In addition, since the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right, and that reasonable jurists would not find this Court's rejection of this ground to be debatable or wrong, it will deny the Petitioner a certificate of appealability on this sub-claim.

In sum, the Court overrules Petitioner's Objections (Doc. #44) to the Report and Recommendations on Remand (Doc. #41) of Magistrate Judge Merz and denies Petitioner a certificate of appealability on the three sub-claims addressed herein.  The Court adopts that Report and Recommendations.

Based upon this Decision and its Decision of September 30, 2003 (Doc. #40), the Court directs that judgment be entered in favor of the Respondent and against the Petitioner on all claims.

It is anticipated that Petitioner will seek leave to appeal <u>in</u> <u>forma</u> <u>pauperis</u>. Such a motion will be granted.  The Petitioner is granted a certificate of appealability on his Sixteenth Claim.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

August 15, 2005

/s/ Walter Herbert Rice
_____
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of record.